Hawkins, J.,
delivered the opinion of the Court.
The indictment in this case contains two counts. The first charges Grip. McGlothlin, Gloster McGloth-lin, Hardy Byrums, Allen Bunton, Charles Bunton, Joseph Blaine, Ephraim Craves, Jerome Duncan and Ceorge Bell, all free men of color, with larceny, in taking one thousand dollars in gold, and five hundred dollars in silver, the property of Rebecca Wright.
The second count charges that said defendants, did fraudulently and feloniously receive one thousand dol- *225 iars in g©ld, and five hundred dollars in' silver, the property of one Rebecca Wright, well knowing the same to have been stolen, eta
The indictment was found at the October Term, 1865, of the Circuit Court for the County of Sumner, and at the same term of the Court, O-ip. and Gloster McGlothlin, Allen Bunton, Ephraim Graves, Charles Bunton, doe Blaine and 5eróme Duncan, were arraigned, plead “not guilty/' and tried; Graves, Duncan and Blaine, were acquitted; Gip. Mc-Glothlin, Gloster McGlothlin, Allen Bunton and Charles Bunton, were found “guilty of „ grand larceny, as charged in the bill of indictment,” and their term of imprisonment in the Penitentiary of the State, fixed at six years.
The Court proceeded to pronounce judgment upon the finding of the jury, to which Gip. McGlothlin, and Allen Bunton have submitted. Gloster McGloth-lin and Charles Bunton moved for a new trial and in arrest of judgment, which motions being overruled, they have appealed to this Court, and now insist that the evidence does not sustain the verdict of the jury, and that upon the trial, incompetent evidence was admitted against them. It appears, from the bill of exceptions in the cause, that about the time the Union army advanced into this State, in 1862, one G. T. Wright, a son of Rebecca Wright, for safe keeping, placed some seventeen or eighteeu hundred dollars in gold and silver coin, in a jar, which he buried in the smoke-house, where it remained undisturbed until the night of the 22d of September, 1865, when *226 Henry Byrum, who had been informed by Evelina Wright, a colored girl, where the treasure was hidden, procured a hoe, dug under the smoke-house, unearthed the jar, emptied the contents into a bag, and felon-iously carried them away. The girl, Eveline, was with him when he commenced digging, but left him at his work, and went into the kitchen. After a while, he called her, and when she returned, he pulled her into the smoke-house, and there proceeded to empty the jar and carry away the coin, saying he was going to put it in the woods. With this exception, no one appears to have been with him during the transaction? and there is no evidence that any other person was about, except the statement of Eveline, that before Hardy got the hoe, and commenced digging, she heard a noise like some one riding by, and heard some one speak to the dog, but did not see him or know who it was. The officer and others engaged in arresting the parties accused, were armed, and made the arrest with presented pistols in their hands. After the arrests were made, the constable told them that "it would be better for them if they would come out and tell all about it; that it would go easier with them; that they had evidence against them that would send them to the Penitentiary.” Other' persons present told them "that, it would be better for them to confess and tell all about it, and tell where the money was; that they would bail the one who would tell all about the money; that if they did not tell about it, they would go to the Penitentiary, and probably be hung.” And one witness states, “these prom *227 ises and threats continued until the, trial was over, and the defendants committed.” Under these circumstances, ' and whilst surrounded with armed men, several of the accused parties were induced to make confessions to the committing magistrate, and others. These confessions were separately made, and upon the trial in the Circuit Court, although objected to, were read in evidence, not only against the parties severally making them, hut also against the other defendants. The law is well settled, that admissions or confessions, made under such circumstances, are not admissible as evidence, even against the party making them; and much less can they be admissible against other persons; and in no instance, as we believe, has it ever been holden, that confessions made by one party, are admissible as evidence against another party. But the Justice of the Peace says, “that after he had examined each of the defendants, as witnesses against each other, he explained to each defendant they were at liberty to make a statement, if they wished to do so, and cautioned .them as to their confessions, and told them that their statements could be used as evidence against them, and they were not bound to say anything against themselves.” And the question is, are the confessions thereby made admissible as evidence against the parties making them. We think not. It, is true, that confessions made, after promises or threats have been used, will be received as evidence, provided it is made clearly to appear, that they exercised no influence over the mind of the accused, at the time the confession was made. A con *228 fession, to be received, must be freely and voluntarily made, and where the mind has been placed under restraints, by the flattery of hope or the terror of fear, for the purpose of forcing the accused to make a confession, it 'must appear that prior to the confession, it had become again free, and totally relieved from the influence of the hopes or fears, induced by the promises or threats which had been used, else the confession will not be admissible. But it will be observed that the statement of the justice to the prisoners, does not contain one word, which indicated to them, that the fears or hopes which might have been engendered by the promises and threats made before that time, were groundless or delusive. What will or will not be sufficient, to deprive the mind of its free volition, or, when once so deprived, to restore it again to freedom, must depend upon the circumstances surrounding the accused, his intelligence, mental capacity, etc.;’ and when it is remembered, that •that the threats and promises of those by whom the accused were surrounded, were continued, from the time of the arrest, during the trial, during the times they were making the confessions, and up to the time of their conviction, i,t will scarcely be contended that the statement of the justice of the peace, could reasonably have had the effect to have restored their minds to perfect freedom, and to have entirely removed the influence of such threats and promises; and more especially when we remember, that the accused were ignorant negroes, who, amidst the convulsive throes of one of the most terrible civil wars *229 which, the world has ever witnessed, had hut recently been released from the yoke of bondage. Under such circumstances, we think the language of the Court, in the cas'e reported in Peck’s Reports, 141-2, is not only peculiarly and fitly illustrative of the condition of the accused, at the time these confessions were made, but is also entitled to great weight. In that case the Court said:
“Evidence of confessions is liable, to a thousand abuses. They are generally made by persons • under arrest, in great agitation and distress, when every ray of hope is eagerly caught at, and frequently under the delusion, though not expressed, that the merits of a disclosure will be productive of personal safety — in want of advisers, deserted by the world, in chains and degradation, their spirits sunk, fear predominant, hope fluttering- around, purposes and views momentarily changing, a thousand plans alternating, a soul tortured with anguish, and difficulties gathering into a multitude. How uncertain must be the things which are uttered in such a storm of passion.”
This Court, in the case of Deathridge vs. The State, 1 Sneed, 75, said: “If a confession be free and voluntary — if it appear to proceed merely from a sense of guilt, and not from the influence of hope or fear, in any degree, it is competent. But if the confession be the result of hope or fear, induced or excitfed by a person having power "over the prisoner, it becomes incompetent.” The law having regard to its own justice, and the weakness of human character, will exclude any such confession. The confession of *230 one of the plaintiffs in error, Grloster McGrlothlin, also of Grip. McGrlothlin, Allen Bunton and Jerome Duncan, were given in evidence, not only as against the parties making them, but also against the other prisoners.
But it is insisted, that, although the confessions may have been made under such circumstances, as would render them inadmissible, yet they are made admissible, by the fact that they led to the discovery of the stolen money. In the case before referred to, of Deathridge vs. The State, this Court said: “On this subject, the rule is, that so much of the confession as relates strictly to the fact discovered by it, may be given in evidence; for the reason of rejecting extorted confessions, is, the apprehension that the prisoner may have been induced to say what is false, but the fact discovered shows that so much of the confession as immediately relates to it, is true.”
It was competent to prove that Grloster stated where the money might be found, and that the stolen money was found at the place indicated by him; and in that state of the case, that is all of the confession that is competent; and if he had stated, at the same time, that he received it from some one else to conceal, knowing it was stolen, or himself had taken it from the jar in the smoke house and put it there, that would be incompetent as evidence. There is no proof whatever to be found in the record against the prisoner, Charles Bunton, except in the statements of his co-defendants. The evidence entirely fails to establish that either of the plaintiffs in error had con *231 spired or confederated with Hardy, or any one else, for the purpose of committing the larceny, or were either actually or constructively present, aiding, or for the purpose of aiding, in the accomplishment of the enterprise, or, in any manner, had any thing to do with it, or had any knowledge of the felonious purposes of Hardy, or even had any knowledge of the existence of the hidden treasure.
Prior to the theft, therefore, the statements of Hardy, who was not on trial, to the witness, Eveline, were incompetent, and ought to have been rejected. There is proof in the record, the character or effect of which we do not deem it necessary or proper to comment upon at this time, showing, that after the larceny, Grloster Mc-Glothlin had some of the stolen money in his possession, and that he had received it knowing it to have been stolen. But, for the present, waiving the -question as to the competency of this proof, it, nevertheless, fails to convict him of the crime of which he has been found guilty. We are not only satisfied that incompetent evidence was improperly admitted on the trial, but that the verdict against the plaintiffs in error is wholly unsupported by the evidence in the cause; and for these reasons, a new trial ought to be granted.
Other grounds of error have been assigned, and relied upon in argument, but as those to which we have referred are decisive of the rights of the prisoners to a new trial, we do not deem it necessary now to determine questions which may, or may not, arise in the case hereafter.
The judgment of the Circuit Court will be reversed; the cause remanded, and a new trial awarded.